IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| JACOB SMITH,<br>　　　　　Plaintiff,<br><br>　　vs.<br><br>THOMAS WILSON, LEROY KIRKEGARD,<br>BEAU BALTEZAR, DANEL SEGOVIA,<br>MIKE BATISTA, TOM WOOD, MITCHELL<br>CALES, JASON GRIMMIS, PAUL REES,<br>and AMBER EDWARDS,[1]<br><br>　　　　　Defendants. | CV 17-00119-H-DLC-JTJ<br><br><br>ORDER AND FINDINGS AND<br>RECOMMENDATIONS OF UNITED<br>STATES MAGISTRATE JUDGE |

Plaintiff Jacob Smith, a state prisoner proceeding in forma pauperis and without counsel, filed his original Complaint on December 29, 2017 alleging retaliation and excessive use of force.  (Doc. 2).  On May 14, 2018, he moved to amend to add medical deliberate indifference claims (Doc. 14), the Court granted the motion, and filed his First Amended Complaint on April 3, 2019.  (Doc. 33; Doc. 34).  On August 19, 2019, Mr. Smith again moved to amend his pleadings seeking to add Mitchell Cales as a defendant.  (Doc. 61.)  The Court granted the motion and filed the Second Amended Complaint on October 8, 2019.  (Docs. 106; Doc. 107).

The Second Amended Complaint is now the operative pleading in this

---

[1] The case style has been amended to reflect the dismissal of Defendant Steyh.  (Doc. 136.)

matter.  In that pleading, Mr. Smith alleges that while incarcerated at the Lewis and

Clark Detention Center (LCCDC) from October 2015 until November 4, 2016 he

filed numerous grievances, complaints, and lawsuits against Defendant Grimmis

and his friends and colleagues, and Department of Corrections (DOC) employees

and contractors.  He claims that in retaliation for these filings, Defendant Grimmis

communicated false information to DOC employees with the intention to override

Mr. Smith to prison before the conclusion of his criminal proceedings in Jefferson

and Lewis and Clark counties.

Mr. Smith was transported to Montana State Prison (MSP) on November 4,

2016 and claims that upon his arrival, Defendant Baltezar assaulted him by

twisting and spraining his right wrist and Defendant Cales dislocated his left index

finger by moving it in a back and forth motion.  He claims Defendants Wilson,

Kirkegard, Wood, Segovia, and Batista were aware of a number of incidents of

assault, misuse of force, or mistreatment of prisoners prior to this incident and

acquiesced, failed to train, supervise, discipline, investigate, and control their

officers.  Mr. Smith was placed in the Locked Housing Unit (LHU) upon his

arrival at MSP and was moved to the Martz Diagnostic Intake Unit (MDIU) on

November 10, 2016.  (Doc. 107.)

The following motions are pending:  (1)  Jason Grimmis's Motion for

Summary Judgment (Doc. 84); (2)  Mr. Smith's Motion for Summary Judgment

against Defendant Grimmis (Doc. 100); (3) Montana State Prison Defendants'

Motion for Summary Judgment for Failure to Exhaust Administrative Remedies

(Doc. 120); (4) Defendants Baltezar and Cales' Motion for Summary Judgment on

Excessive Force Claims (Doc. 124); (5) Defendants Rees, Edwards, and Batista's

Motion For Summary Judgment on Deliberate Indifference Claims (Doc. 128); (6)

Defendants Thomas Wilson, Danel Segovia, Mike Batista, Leroy Kirkegard, and

Tom Wood's Motion For Summary Judgment on Supervisory Liability Claims

(Doc. 132); (7) Mr. Smith's Motion for an Order to Compel Discovery (Doc. 153);

(8) Mr. Smith's Opposed Motion for Sanctions against Jason Grimmis and

Mitchell Young (Doc. 157), and (9) Mr. Smith's Opposed Motion for Leave to

Amend Second Amended Complaint (Doc. 177).

     The Court recommends that Defendant Grimmis's motion for summary

judgment and the MSP Defendants' exhaustion motion be granted and Mr. Smith's

motion to amend and all other motions for summary judgment be denied.  Mr.

Smith's motion to compel and motion for sanctions will be denied.

## I.  SUMMARY JUDGMENT STANDARD

     Summary judgment is appropriate when the moving party "shows that there

is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law."  Fed.R.Civ.P. 56(a).  Under summary judgment practice, "[t]he

moving party initially bears the burden of proving the absence of a genuine issue

of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010)

(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party may

accomplish this by "citing to particular parts of materials in the record, including

depositions, documents, electronically stored information, affidavits or

declarations, stipulations (including those made for purposes of the motion only),

admissions, interrogatory answers, or other materials" or by showing that such

materials "do not establish the absence or presence of a genuine dispute, or that the

adverse party cannot produce admissible evidence to support the fact."

Fed.R.Civ.P. 56(c)(1)(A), (B).

  "Where the non-moving party bears the burden of proof at trial, the moving

party need only prove that there is an absence of evidence to support the

non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (*citing Celotex*, 477 U.S.

at 325); *see also* Fed.R.Civ.P. 56(c)(1)(B).  Summary judgment should be entered,

"after adequate time for discovery and upon motion, against a party who fails to

make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial." *See*

*Celotex*, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential

element of the nonmoving party's case necessarily renders all other facts

immaterial." *Id.* at 323.  In such a circumstance, summary judgment should be

granted, "so long as whatever is before the district court demonstrates that the

standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."
*Id.*

    If the moving party meets its initial responsibility, the burden shifts to the
opposing party to establish that a genuine issue of material fact exists. *Matsushita*
*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To establish
the existence of this factual dispute, the opposing party may not rely upon the
allegations or denials of its pleadings but is required to tender evidence of specific
facts in the form of affidavits, and/or admissible discovery material, in support of
its contention that the dispute exists. *See* Fed.R.Civ.P. 56(c)(1); *Matsushita*, 475
U.S. at 586 n.11. "A plaintiff's verified complaint may be considered as an
affidavit in opposition to summary judgment if it is based on personal knowledge
and sets forth specific facts admissible in evidence." *Lopez v. Smith*, 203 F.3d
1122, 1132 n.14 (9th Cir. 2000) (en banc). The opposing party must demonstrate
that the fact in contention is material, i.e., a fact "that might affect the outcome of
the suit under the governing law," and that the dispute is genuine, i.e., "the
evidence is such that a reasonable jury could return a verdict for the nonmoving
party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec.*
*Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

    "In evaluating the evidence to determine whether there is a genuine issue of
fact," the court draws "all inferences supported by the evidence in favor of the

non-moving party." *Walls v. Cent. Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  *See Richards v. Nielsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586 (citations omitted).

Defendants advised Mr. Smith of the requirements for opposing a motion for summary judgment in their September 27, 2019 and November 1, 2019 Rand Notices.  (Docs. 87, 123, 127, 131.)  *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998)(en banc); *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

## II.  FACTS

### A.  Lewis and Clark County Detention Center

On October 16, 2015, Mr. Smith was incarcerated at LCCDC after his arrest on warrants for probation violations out of Jefferson County and Silver Bow County and on a warrant from Lewis and Clark County on new criminal charges. (Grimmis Statement of Undisputed Facts, Doc. 86 (hereinafter "Grimmis SUF—Doc. 86") at ¶ 1.)

On March 24, 2016, the Silver Bow County District Court revoked Mr. Smith's probation and sentenced him to the DOC for a period of five years.  After Mr. Smith was sentenced in Silver Bow County, Captain Grimmis began speaking

6

with Mr. Smith's probation officers about transferring him to MSP because of

issues Mr. Smith's behavior was causing at LCCDC.  (Grimmis SUF—Doc. 86 at

¶ 9; Grimmis Affidavit, Doc. 86-7 at ¶ 10.)

On September 22, 2016, Captain Grimmis wrote a letter to Adult Probation

and Parole stating:

> Jacob Smith was arrested on October 12, 2015.  During his time here,
> he has accumulated 27 enemies.  Three people that I remember left
> the pod with a visible injury to their face but claimed that they fell in
> the shower.  Those inmates are Tilman Nunguesser, Chris
> Rasmussean and Keith Wear.  Jacob Smith called up the control room
> saying that Inmate Chad Laverdiere was a "rat" and when we moved
> Laverdiere to Pod 1, Jacob Smith said to list him as an enemy with
> everyone in Pod 1 since they are now harboring a "rat."
>
> On June 8, 2016, Inmate Gerald Laforge reported to a deputy that
> Jacob Smith put a "hit" out on Laforge's wife.  Jacob Smith was also
> seen on video accosting Laforge in the library while he was walking
> past him to the clinic.  Inmate Bryan Haynes complained that Jacob
> Smith was bulldogging the pod and if food was not given to him by
> inmates, they get kicked off the block.  Inmate Mike Roope reported
> Jacob Smith for bullying and fighting and also having drugs in his
> room.  Inmate Roope had to be moved out of the pod and to
> Broadwater County Detention Center after this report.
>
> Jacob Smith has filed 118 Inmate Requests, 70 Inmate Grievances, 12
> Medical Requests and 11 Medical Grievances since he arrived in the
> facility.  He is continually arguing with staff over mail, items in his
> room, Probation and Parole, copies, legal information and various
> other things.  His grievances and requests require an enormous
> amount to time to look into and answer.  Jacob Smith has also been
> writing grievances, requests and complaints for other inmates in his
> pod.
>
> Officers have found trash bags of water in his room and pillowcases
> of books that he used to life weights with.  Due to the numerous

7

grievances against officers, managing him has been difficult.  No one is going into his room and he has more books, mail and paperwork than anyone in the facility.

Jacob Smith has many civil suits that he is trying to file and getting things back and forth to the civil office and courts has us running for him quite a bit.  We are frequently making copies for him.

Jacob Smith has fired numerous attorneys and has many cases he is working on and trying to be pro se with.

Sincerely,
Captain Jason Grimmis.

(Grimmis SUF—Doc. 86 at ¶ 9; Doc. 101-1.)

The next day, on September 23, 2016, Probation and Parole Officer Michelle

Jenicek submitted an MSP Override & Referral Form stating:

This offender received a 5 year DOC sentence on a PTR on 3/24/16 in Silver Bow County.  This offender has multiple felony convictions, has been in the correctional system since 1997, with 42 location changes, completion of Nexus (after 2 attempts), and multiple disciplinary hearings while incarcerated.  We made no initial placement decisions due to his other pending legal mater in Jefferson (PTR) and Lewis and Clark (new felonies) counties.  However, this offender has been incarcerated in the local jail for approximately one year now.  His pending legal matters are still not adjudicated, as this offender has fired multiple public defenders, and as a result, his Court proceedings have been continued or delayed on numerous occasions. His behavior in Court and at the jail has been problematic at best (please see attached confidential documents).  The Lewis and Clark County Jail has gone out of their way to accommodate him and effectively dealt with his problem behavior there, however, his needs would best be met at Montana State Prison.  Both Jefferson and Lewis and Clark Counties have agreed to transport him back from the prison for Court proceedings in their jurisdiction.  This over-ride has been previously approved via e-mail by BC Jennie Hanse, and legal counsel Ira Eakin and Colleen Ambrose.

(Doc. 101-1 at 4.)  The request for override was approved on September 26, 2016. (Doc. 101-1 at 5.)

On October 26, 2019, the Jefferson County District Court revoked Mr. Smith's probation and sentenced him to the DOC for a period of five years to run concurrently with the sentence from Silver Bow.  (Grimmis SUF—Doc. 86 at ¶ 2.) On November 4, 2016, Mr. Smith was transferred from the LCCDC to MSP. (Grimmis SUF—Doc. 86 at ¶ 3.)

## B.  Montana State Prison

### 1.  Exhaustion Procedure

When inmates arrive at MSP, they are required to attend orientation, which includes an explanation of the process and procedures of the grievance program. (Montana State Prison Defendants' Statement of Undisputed Facts on Failure to Exhaust Administrative Remedies, Doc. 122 (hereinafter "MSP SUF—Doc. 122") at ¶ 2.)  Mr. Smith completed orientation—including the orientation on the grievance process—at MSP during one of his prior incarcerations there on January 15, 2012.  (MSP SUF—Doc. 122 at ¶ 4.)  During orientation, inmates are informed that if they do not first exhaust their administrative remedies for classifications, grievances, or disciplinary decisions, they will be unable to challenge the issue in court.  (MSP SUF—Doc. 122 at ¶ 5.)

According to MSP Procedure 3.3.3, an inmate must file a grievance for any

9

"issues including, but not limited to… staff conduct… and other standard grievance matters…"  (MSP SUF—Doc. 122 at ¶ 12.)  The only exceptions, or "non-grievable issues," are "actions by outside entities not under the jurisdiction of the DOC," and "classification, disciplinary, and any other decision which is subject to a separate appeal procedure or administrative review process."  (MSP SUF— Doc. 122 at ¶ 13.)

There are four steps to the grievance procedure for standard and health services grievances:  (1) informal resolution, (2) formal grievance, (3) appeal to the Warden, and (4) appeal to the DOC director.  There are three steps to the grievance procedure for staff conduct and policy and operational procedure grievances:  (1) informal resolution, (2) formal grievance, and (3) appeal to the DOC director.  (MSP SUF—Doc. 122 at ¶ 14.)  A staff conduct or other general grievance must be submitted to MSP within five working days of the grievable incident or conduct, and each appeal step has timelines which may be extended upon a showing of good cause in extraordinary circumstances.  (MSP SUF—Doc. 122 at ¶ 15.)  A grievance alleging excessive force or retaliation by MSP staff typically is considered a staff conduct grievance.  (MSP SUF—Doc. 122 at ¶ 16.)  MSP Procedure 3.3.3 expressly notifies each inmate that, if he fails "to advance to the next level of the grievance Program within the stated time limit, he will be considered to have forfeited the opportunity to exhaust his administrative remedies

under the inmate grievance program." (MSP SUF—Doc. 122 at ¶ 17.)

### 2. Mr. Smith's Grievances

Between November 4, 2016 and May 2019, Mr. Smith used the MSP inmate grievance program 43 times. (MSP SUF—Doc. 122 at ¶ 22.) These included the following grievances/complaints: December 12, 2016 grievances regarding placement in max on November 4, 2016; September 7, 2017 grievances regarding MORRA assessment; December 21, 2017 Claim No. 27414 filed with the Department of Administration Risk Management and Tort Defense Division; December 2017 letter to the Governor's Office with grievances regarding MSP employees; December 28, 2017 grievances regarding medications; January 15, 2018 Letter to Cindy Hiner, DOC Medical Bureau Chief regarding medication condition and outside consult; March 8, 2018 grievances regarding attorney call; March 21, 2018 grievance re: legal mail; May 31, 2018 grievances regarding pat down search; June 26, 2018 grievance regarding visitation; September 19, 2018 grievance re: prostate condition; October 6, 2018 grievance re: prostate condition; October 15, 2018 grievance re: medications; October 16, 2018 grievance re: transport; October 16, 2018 grievance re: med appointment; October 16, 2018 grievance re:  STG; October 19, 2018 grievance re: infirmary; December 5, 2018 grievance re: pre-release; December 6, 2018 grievance re: shoulder; December 9, 2018 grievance re: medication; December 18, 2018 grievance re: personal

information; January 7, 2019 grievance re: staff; January 21, 2019 grievance re: Dr. Rees; February 22, 2019 grievance re: fans; February 23, 2019 grievance re: infirmary; May 2, 2019 grievance re: Sgt. Jones; May 4, 2019 grievance re: Sgt. Jones; and May 4, 2019 grievance re: Sgt. Jones.  (MSP SUF—Doc. 122 at ¶ 23.)

Mr. Smith has filed the following federal lawsuits in this Court:  6:17-cv-00111-DLC-JTJ, *Smith v. Fletcher et al*, filed 12/04/17, voluntarily dismissed 12/29/17; 6:17-cv-00119-DLC-JTJ (current action), 6:20-cv-00005-BMM-JTJ, *Smith v. Pfister et al*, filed 01/17/20; and 6:20-cv-00018-BMM-JTJ *Smith v. Carter et al.* filed 03/09/20.

## III. SUMMARY JUDGMENT ANALYSIS

### A. Alleged Retaliation by Captain Grimmis

Mr. Smith contends Captain Grimmis's request to transfer Mr. Smith from LCCDC to MSP was done retaliation for Mr. Smith exercising his First Amendment rights to filing grievances and seek legal redress.  As an initial matter, prisoners have no constitutional right to incarceration in a particular institution. *Olim v. Wakinekona*, 461 U.S. 238, 244-48 (1983); *Meachum v. Fano*, 427 U.S. 215, 224 (1976), even if the transfer is for disciplinary reasons or to a considerably less favorable institution.  *Montanye v. Haymes*, 427 U.S. 236, 242 (1976) ("As long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the

12

Constitution, the Due Process Clause ... does not require hearings in connection with transfers whether or not they ... may be labeled as disciplinary or punitive."). A prisoner's liberty interests are sufficiently extinguished by his conviction that the state may generally confine or transfer him to any of its institutions, to prisons in another state or to federal prisons, without offending the Constitution. *See Rizzo v. Dawson*, 778 F.2d 527, 530 (9th Cir. 1985) (*citing Meachum*, 427 U.S. at 225) (intrastate prison transfer does not implicate Due Process Clause). Thus, once Mr. Smith was convicted and sentenced in Silver Bow County on March 24, 2016, his liberty interests were sufficiently extinguished that he could be transferred to any state institution.

Such a transfer, however, could not be made in retaliation for the exercise of his First Amendment rights. "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

Retaliation claims, however, must be evaluated in light of the concerns of excessive judicial involvement in day-to-day prison management, and courts must therefore "afford appropriate deference and flexibility" to prison officials in the

13

evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory. *Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995.)

For purposes of this analysis, the Court will assume that Captain Grimmis took the adverse action of requesting that Mr. Smith be transferred to MSP at least in part because of Mr. Smith's protected conduct and that such action would chill an ordinary inmate's exercise of his First Amendment rights. The remaining issue, therefore, is whether Captain Grimmis's requests for Mr. Smith's transfer advanced a legitimate correctional goal. The Court finds that they did.

Regardless of whether Captain Grimmis made alleged false statements to Probation and Parole regarding Mr. Smith's disciplinary behavior at LCCDC, it is undisputed that Mr. Smith filed an inordinate amount of inmate requests, grievances, medical requests, and medical grievances. He admitted in his deposition that he filed numerous complaints and grievances while at LCCDC, that it was "kind of a common practice of mine," and that he began as soon as he got there. (Grimmis Statement of Disputed Facts, Doc. 116 at ¶ 18 citing Smith Depo. at p. 181—Doc. 116-2 at 7.) These complaints were filed against officers Troy Christensen, Karla Ivie, Jason Grimmis, Marc Kittleson, Christen Thennis, and Brian Fischer; bail bondsman Mike Soto; attorneys Mike Kakuk and Mariah Eastman; Child Services agents Patti Renenger and Krista Mix; District Attorney Tara Harris; and medical and mental health providers. (Smith's Statement of

Undisputed Facts, Doc. 100 at ¶ 10; Grimmis Statement of Disputed Facts, Doc. 116 at ¶ 10.)

The following are documented examples in the record of Mr. Smith's complaints and/or grievances which he filed between December 2015 and September 2016: December 2015 complaint against Sgt. Troy Christensen; January 16, 2016, January 17, 2016, and January 19, 2016 letters to Undersheriff David Rau complaining about Karla Ivie (Doc. 103-1 at 21-24); pro se motions filed in DDC-2015-400 in January 2016; complaints and grievances against Captain Grimmis for denying him access to legal materials, contact with witnesses, phone calls, copies, and documents; February 29, 2016 letter to Undersheriff Rau requesting criminal court proceedings against Officer Karla Ivie (Doc. 103-1 at 27); March 16, 2016 letter to Mike Batista complaining about Probation and Parole (Doc. 103-1 at 29-31); June 8, 2016 Voluntary Statement with Lewis and Clark County Sheriff's Office against Mike Kakuk (Doc. 103-1 at 6); July 2, 2016 Voluntary Statement with Lewis and Clark County Sheriff's Office against Mike Kakuk (Doc. 103-1 at 3); July 2, 2016 Voluntary Statement with Lewis and Clark County Sheriff's Office against Mariah Eastman (Doc. 103-1 at 5); July 25, 2016 Citizen Complaint against Christen Thennis for witness tampering (Doc. 103-1 at 1); July 2016 pro se motions filed in DDC-2015-114; July 29, 2016 contentious district court hearing when Mr. Smith complained about Probation and Parole;

15

August 8, 2016 Criminal Complaint for Aggravated Kidnapping against Patti Renenger (Doc. 103-1 at 8-12); August 8, 2016 Criminal Complaint for Tampering with Evidence and Perjury against Marc Kittleson (Doc. 103-1 at 16-20); and September 4, 2016 Criminal Complaint for Evidence Tampering, Witness Tampering and Official Misconduct against Officer Brian Fischer (Doc. 103-1 at 13-15).

Mr. Smith also described additional grievances and litigious activity.  First, he claims that between October 2015 and February 2016, he lodged complaints against Captain Grimmis, Sgt. Christensen, and Officer Ivie.  (Doc. 109 at 9.)  He alleges Captain Grimmis offered him an attorney phone call in exchange for dropping the complaint against Sgt. Christensen.  Mr. Smith represented himself in his criminal cases and contends Captain Grimmis personally denied him access to legal materials, contact with witnesses, phone calls, copies, and documents.  Mr. Smith also lodged grievances and complaints against Captain Grimmis with Grimmis's supervisor Undersheriff Dave Rau.  He claims that in response, Sgt. Christensen entered his cell and destroyed his family photographs.  He also claims he filed a civil complaint against Probation and Parole Officer Marc Kittleson for tampering, perjury, and fraudulent concealment; a criminal complaint with Helena law enforcement against Probation and Parole Officer Kittleson for assaulting Mr. Smith's wife; a complaint against Probation and Parole officers Kittleson and

Annette Carter for illegally confiscating his phone and his wife's phone; and claims filed in 2016 with the Department of Administration Tort Claims Defense Division against Probation and Parole, DOC, Kittleson, Annette Carter, Michelle Jenicek, Christen Thennis, and Deanne Loungee.

He also contends he grieved the following issues:  denial of a haircut, denial of mental health treatment, denial of evidence and hearings on false infractions, denial of contact with his lawyers, orders by Captain Grimmis to officers to deprive and hinder Mr. Smith's litigations, and other legitimate issues.  (Doc. 101 at 7-8.)  Mr. Smith's "Resident Request Report" documenting his kiosk complaints was 63 pages long.  (Doc. 103-2.)  Mr. Smith does not dispute the sheer volume of grievances set forth in Captain Grimmis's September 22, 2016 letter as being: "118 Inmate Requests, 70 Inmate Grievances, 12 Medical Requests and 11 Medical Grievances since he arrived in the facility." (Doc. 101-1 at 1.)

In addition, Mr. Smith initiated the following state court lawsuits during 2016 while he was at LCCDC:  *Smith v. Soto, et al.,* DV 2016-347 First Judicial District Court DV 2016-347; *Smith v. Eastman, et al.,* First Judicial District Court, DV 2016-628; *Smith v. Kakuk,* First Judicial District Court, DV 2016-629; *Smith v. Office of Public Defender,* First Judicial District Court ADV-2016-630--dismissed on motion of Defendant on December 19, 2016, *Smith v. Fisher, et al.,* First Judicial District Court, BDV 2016-672--voluntarily dismissed by Mr. Smith on

17

October 13, 2017, *Smith v. Reneger, et al.,* First Judicial District Court, DDV 2016-685, voluntarily dismissed by Mr. Smith on October 10, 2016; *Smith v. Kittleson, et al.* First Judicial District Court, DDV 2016-699; *Smith v. Christen, et al.,* First Judicial District Court, BDV-2016-734.  (Doc. 17 at 14-15.)

The Court finds instructive *Ward v. Dyke*, 58 F.3d 271 (6th Cir. 1995). In that case, the plaintiff was a prisoner at the Ionia Temporary Facility but was transferred to the Chippewa Temporary Facility after filing numerous grievances against prison staff.  *Id.* at 272.  The plaintiff filed suit under 42 U.S.C. § 1983, alleging that he was transferred as retaliation for exercising his First Amendment right to seek redress of grievances.  *Id*.  The defendants filed a motion for summary judgment which the district court denied.  On appeal, the Sixth Circuit reversed the district court and entered judgment in favor of the defendants.  *Id*.

On appeal, the defendants argued, and the Sixth Circuit agreed, that "there is no constitutional right not to be transferred from one level II institution to another when prison officials, in the exercise of their discretion, determine that a prisoner is an adjustment problem."  *Id*. at 274.  The Sixth Circuit noted that "[t]he ability to transfer a prisoner who is interfering with prison administration and staff morale goes to the essence of prison management."  *Id.* at 274. Therefore, the plaintiff's constitutional rights were not violated when he was transferred, even though the admitted reason for the transfer was the plaintiff's repeated filing of grievances:

"[e]ven if defendants' actions had some effect on Ward's future filing of grievances, his transfer is permissible where it serves a legitimate penological interest." *Id.* at 275.  The Sixth Circuit also held that it was irrelevant that "the new facility, although also a level II facility, is less desirable than the facility from which Ward was transferred." *Id.*

As set forth above, the facts in Mr. Smith's case are similar.  It is undisputed that Mr. Smith filed numerous grievances against LCCDC staff as well as general grievances, medical grievances, and state court lawsuits.  It is also undisputed that the sheer number of grievances and requests required an enormous amount of staff time to address and diverted staff attention from their day to day duties.  (Grimmis Aff. Doc. 86-7 at 2, ¶ 5; Grimmis SUF, Doc. 86 at ¶ 7.)  It is also undisputed that Mr. Smith made frequent demands that LCCDC staff assist him with his various legal claims by making copies and delivering documents and that these requests diverted staff time and attention from their regular duties.  (Grimmis Aff., Doc. 86-7 at 3, ¶ 6.)  It is also undisputed that MSP is designed as a long-term incarceration facility for prisoners and has more housing options, more staff, and more resources to deal with high maintenance inmates.  (Grimmis SUF, Doc. 86 at ¶ 8.)

While a prisoner may not be subjected to adverse action merely for filing grievances, the right to assert grievances is not unqualified. *Wolfel v. Bates*, 707 F.2d 932, 934 (6th Cir. 1983).  A prisoner cannot file grievances and litigations in

such a manner that it violates legitimate penological objectives. "Abusive or manipulative use of a grievance system [is] not ... protected conduct," and prison officials may take action in response to the prisoner's improper use of the grievance process as long as the response aligns with a legitimate penological goal. *King v. Zamiara*, 680 F.3d 686, 699 (6th Cir.2012), *cert. denied*, —— U.S. ——, 133 S.Ct. 985, 184 L.Ed.2d 773 (2013).

Captain Grimmis was clear in his September 22, 2016 letter that he was requesting the transfer of Mr. Smith because:

> Jacob Smith has filed 118 Inmate Requests, 70 Inmate Grievances, 12 Medical Requests and 11 Medical Grievances since he arrived in the facility. He is continually arguing with staff over mail, items in his room, Probation and Parole, copies, legal information and various other things. His grievances and requests require an enormous amount to time to look into and answer. Jacob Smith has also been writing grievances, requests and complaints for other inmates in his pod.

> Officers have found trash bags of water in his room and pillowcases of books that he used to life weights with. Due to the numerous grievances against officers, managing him has been difficult. No one is going into his room and he has more books, mail and paperwork than anyone in the facility.

> Jacob Smith has many civil suits that he is trying to file and getting things back and forth to the civil office and courts has us running for him quite a bit. We are frequently making copies for him.

(Doc. 101-1 at 1.) Mr. Smith does not dispute that he filed numerous grievances, that managing him became difficult because he filed many grievances against LCCDC officers, and that his litigation activities created a burden on LCCDC

staff.  There is a difference between a transfer motivated by the fact that the inmate filed a grievance and one motivated by the need to maintain institutional and staff efficiency and administration.  *See Ward*, 58 F.3d at 272, 275; *Martin v. Jackson*, 21 Fed.Appx. 443 (7th Cir. 2001).  The Court finds that Mr. Smith's transfer was a result of the latter.

Thus, the Court finds that there is no genuine issue of material fact that Captain Grimmis requested Mr. Smith's transfer to MSP for the legitimate penological interest of facilitating jail administration.  Captain Grimmis's request Mr. Smith's transfer is exactly the type of decision in which the Court must "afford appropriate deference and flexibility" to prison officials in the evaluation of proffered legitimate penological reasons.  *Pratt*, 65 F.3d at 807.  "The ability to transfer a prisoner who is interfering with prison administration and staff morale goes to the essence of prison management." *Ward*, 58 F.3d at 274.  As such, Captain Grimmis's motion for summary judgment should be granted and Mr. Smith's motion for summary judgment should be denied.

## B.  Exhaustion at Montana State Prison

The Prison Litigation Reform Act ("PLRA")'s exhaustion requirement states:

> [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a); *see also Porter v. Nussle*, 534 U.S. 516, 524-25 (2002);

*Booth v. Churner*, 532 U.S. 731, 741 (2001).  This means a prisoner must

"complete the administrative review process in accordance with the applicable

procedural rules, including deadlines, as a precondition to bringing suit in federal

court." *Woodford v. Ngo*, 548 U.S. 81, 88 (2006).  Exhaustion is mandatory.

*Booth*, 532 U.S. at 741; *Jones v. Bock*, 549 U.S. 199, 211 (2007).  Under the

PLRA, prison regulations define exhaustion requirements.  *Jones*, 549 U.S. at 218.

   The defendant bears the ultimate burden of proving failure to exhaust.  *See*

*Brown v. Valoff*, 422 F.3d 926, 936 (9th Cir. 2005).  If the defendant initially

shows that (1) an available administrative remedy existed and (2) the prisoner

failed to exhaust that remedy, then the burden of production shifts to the plaintiff to

bring forth evidence "showing that there is something in his particular case that

made the existing and generally available administrative remedies effectively

unavailable to him."  *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014).

   The Court finds that the MSP Defendants have met this burden.  It is

undisputed that Mr. Smith's claims were grievable pursuant to MSP 3.3.3 and that

Mr. Smith did not grieve these claims prior to filing his Second Amended

Complaint.  (MSP SUF—Doc. 122 at ¶¶ 24-29.)

   As such, it is Mr. Smith's burden to produce evidence demonstrating that

"the local remedies were ineffective, unobtainable, unduly prolonged, inadequate,

or obviously futile." *Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015) (internal citations and quotation marks omitted).  "The ordinary meaning of the word 'available' is 'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.'" *Ross v. Blake*, 136 S.Ct. 1850, 1858 (2016) (*citing Booth*, 532 U.S., at 737-738.)  Mr. Smith has not met this burden.

Upon his arrival at MSP, Mr. Smith was delivered to Internal Prison Security (IPS) officers at Tower 1.  While placing Mr. Smith in handcuffs, Defendant Beau Baltezar, an IPS officer, allegedly grabbed and twisted Mr. Smith's right wrist and correctional officer Mitchell Cales allegedly pulled and bent Mr. Smith's left index finger.  (MSP SUF—Doc. 122 at ¶ 33.)  Mr. Smith was initially placed in the LHU.  On November 10, 2016, he was transferred to the Martz Diagnostic Intake Unit (MDIU).  (Grimmis SUF—Doc. 86 at ¶ 3; MSP SUF—Doc. 122 at ¶ 35.)

Mr. Smith admits he did not utilize the grievance procedure regarding his claims but contends two remarks by MSP officials effectively made MSP's administrative remedies unavailable.  First, he testified he asked Defendant Baltezar how long he would be in LHU and why he was being placed there.  In a "slightly compassionate" manner, Defendant Baltezar replied:  "just be good, if you start filing grievances you'll never get out of here."  (Amended Complaint, Doc. 34 at 24; Second Amended Complaint, Doc. 107 at ¶ 6; Smith Deposition, p.

23

27, line 3-13--Doc. 78-12; MSP SUF—Doc. 122 at ¶ 34.)

Mr. Smith also contends that after he was placed in MDIU on November 10, 2016, he told Unit Manager Steyh, "I need information.  I want to file a grievance." UM Steyh asked what he wanted to grieve, and Mr. Smith claims he responded "[t]he fact I was put in max, the fact that I was assaulted."  (MSP SUF—Doc. 122 at ¶ 36.)  Mr. Smith alleges UM Steyh told him to "leave it alone."  Mr. Smith took this statement as a direct order.  (MSP SUF—Doc. 122 at ¶ 37.)

The Ninth Circuit has held that, "the threat of retaliation for reporting an incident can render the prison grievance process effectively unavailable and thereby excuse a prisoner's failure to exhaust administrative remedies." *McBride v. Lopez*, 807 F.3d 982, 987 (9th Cir. 2015).  In considering this issue, the *McBride* court approved the Eleventh Circuit's test which requires a subjective and objective showing.  *Id*. citing *Turner v. Burnside*, 541 F.3d 1077, 1084-85 (11th Cir. 2008)  The subjective component requires that "a prisoner must provide a basis for the court to find that he actually believed prison officials would retaliate against him if he filed a grievance."  *Id.* at 987.  "If the prisoner makes this showing, he must then demonstrate that his belief was objectively reasonable." *Id.* "That is, there must be some basis in the record for the district court to conclude that a reasonable prisoner of ordinary firmness would have believed that the prison official's action communicated a threat not to use the prison's grievance procedure

and that the threatened retaliation was of sufficient severity to deter a reasonable prisoner from filing a grievance." *Id.* at 988.

In *McBride*, the plaintiff alleged defendants beat him and told him he was "lucky" not to have been beaten more severely; plaintiff then asserted that his subsequent grievance about the beating was untimely because he feared retaliation if he filed it. *Id.* at 985.  The court held that this did not satisfy the objective prong of the test:

> Even if McBride actually viewed the statements as threatening, the issue was whether the guards' statements could reasonably be viewed as threats of retaliation if McBride filed a grievance.  As the district court recognized, the statements themselves make no reference to a grievance or to anything else, beyond the preexisting hostility, that might trigger a future attack on the part of the guards.

*Id*. at 988.

As to the subjective showing, Mr. Smith did not demonstrate a "basis" supporting that he "actually believed" that he would be retaliated against for filing a grievance or that he was actually deterred by any purported threats.  Even after Defendant Baltezar's alleged threat, Mr. Smith indicated his intent to file a grievance to UM Steyh.  He then proceeded to file two informal grievances on December 12, 206 regarding his placement in LHU and access to legal documents. He did not name any of the Defendants in this case in either informal, he did not allege any use of force or excessive use of force, and he did not allege any injury to his person.  Most importantly, he did advance either informal to the formal

grievance level.  (MSP SUF—Doc. 122 at ¶ 23.)  Neither of these informals were

sufficient to have exhausted Mr. Smith's administrative remedies regarding any

alleged assault but they do demonstrate that he was not actually deterred in his use

of the grievance procedure by any purported threats.  While Mr. Smith argues that

he never grieved the alleged use of force, his behavior demonstrates that he was

not so threatened as to not use the grievance process at all.

In addition, Mr. Smith testified that suing people, filing complaints, and

filing grievance was it was "kind of a common practice of mine." (Grimmis

Statement of Disputed Facts, Doc. 116 at ¶ 18 citing Smith Depo. at p. 181—Doc.

116-2 at 7.)  The record is replete with examples of his aggressive litigation tactics

including grievances, lawsuits, and criminal complaints.  No reasonable juror

would believe that Mr. Smith went from having a "common practice" of filing

grievances to being too afraid to submit grievances regarding an alleged use of

force incident simply because an IPS officer told him, in a somewhat

compassionate manner, that if he filed grievances he would not get out of locked

housing or the "leave it alone" comment.

Mr. Smith was no stranger to prison when he arrived there in November

2016.  According to his DOC Movement record, Mr. Smith had been in the

correctional system since 1997 including previous incarcerations at MSP in 2001-

2002, 2009, and 2012.  (Movement Record, Doc. 21-6 at 54-56.)  He was a prolific

litigator while at LCCDC, he was familiar with and demonstrated his knowledge of the grievance procedure at MSP, and yet he never mentioned any of his claims raised herein in any grievance prior to filing this action in December 2017.  As such, Mr. Smith has not demonstrated a "basis" supporting that he "actually believed" that he would face retaliation for filing a grievance or that the purported threats actually deterred him from pursing grievances.

Nor has Mr. Smith shown that even if he did have a basis to fear retaliation that the belief was objectively reasonable.  First, MSP Procedure 3.3.3 and DOC Policy 3.3.3 provide safeguards against any retaliation by staff.  (MSP SUF—Doc. 122 at ¶ 18.)  Pursuant to DOC Policy 3.3.3, "offenders who use the grievance process are guaranteed protection from reprisals," and "no . . . staff member who appears to be involved in a grievance complaint will participate in the grievance resolution process."  (MSP SUF—Doc. 122 at ¶ 19.)  MSP Procedure 3.3.3 implements these policies by providing:  "Staff will not harass, punish, or discipline an inmate for utilizing the inmate grievance process.  Employees will be subject to disciplinary action if they violate this directive," and "[e]xcept for the Department Director, any person implicated in a formal inmate grievance will not participate in the decision-making process concerning the grievance."  (MSP SUF—Doc. 122 at ¶ 20.)  MSP Procedure 3.3.3 further provides that only the grievance coordinator will maintain grievance files; "[t]hey will not be copied into

other files." (MSP SUF—Doc. 122 at ¶ 21.)  These precautions make it less likely that Mr. Smith's fear of retaliation was objectively reasonable.  If Mr. Smith did file a grievance regarding the alleged assaults, neither Defendant Baltezar nor Defendant Cales would have been involved in the grievance process.  Moreover, there is no evidence that either of these Defendants had any control or influence over housing designations.

In addition, Mr. Smith contends the alleged excessive use of force occurred on November 4, 2016.  As such, pursuant to MSP 3.3.3 § III.E.1 the deadline for grieving the claimed assault was five working days from November 4, 2016, or November 14, 2016 (November 4, 2016 was a Friday, as was Veteran's Day, November 11).  (MSP SUF—Doc. 122 at ¶ 23.) [2]  Mr. Smith was placed in MDIU on November 10, 2016 and therefore was transferred out of the LHU before the expiration of the time to grieve the claimed assault.  Therefore, Defendant Baltezar's alleged threat that if Mr. Smith filed grievances he would not get out of locked housing, was no longer applicable since Mr. Smith left locked housing on November 10, 2016 and still had several days to file a grievance regarding the alleged use of force.

---

[2] While the MSP Defendants represent that five working days from November 4 was November 18, the Court counts five working days from November 4 to be November 14 even accounting for Veteran's Day.  Whether the date was November 14 or November 18, it is clear that Mr. Smith had time to file a grievance after he was moved from the LHU.

Objectively speaking Defendant Baltezar's "compassionate" statement that Mr. Smith should be good and not start filing grievances nor UM Steyh single comment to leave it alone were sufficiently severe to deter a reasonable prisoner from filing a grievance, especially after Mr. Smith was released from locked housing. The Court finds that no reasonable juror would believe a reasonable prisoner of ordinary firmness would have believed that these two statements communicated a threat not to use the prison's grievance procedure and that the threatened retaliation was of sufficient severity to deter a reasonable prisoner from filing a grievance.

The MSP Defendants met their burden by demonstrating that there was an administrative grievance remedy available to Mr. Smith and that Mr. Smith did not exhaust that remedy prior to filing his Second Amended Complaint. That is undisputed. Mr. Smith, however, failed to establish a genuine issue of material fact that the given grievance procedure was unavailable to him based upon comments made by MSP staff. Mr. Smith did not exhaust his administrative remedies and the Court finds that he was not subjectively or objectively deterred from filing grievances regarding his claims to the point where the grievance process was "effectively unavailable." *See McBride*, 807 F.3d at 987. The MSP Defendants' Motion for Summary Judgment for Failure to Exhaust Administrative Remedies (Doc. 120) should be granted.

29

## IV.  MOTION TO AMEND

Mr. Smith's original Complaint, filed on December 29, 2017, did not assert any medical deliberate indifference claims.  (Doc. 2).  Mr. Smith did not raise those claims until he moved to amend his Complaint on May 14, 2018 (Doc. 14) and the First Amended Complaint on April 3, 2019.  (Doc. 33; Doc. 34).  Mr. Smith's Second Amended Complaint was filed on October 8, 2019.  (Doc. 106; Doc. 107).  Mr. Smith filed his third motion to amend, on April 10, 2020 (Doc. 177), 23 months after he first asserted his medical deliberate indifference claims against Dr. Rees and Edwards.  The Motion seeks leave to amend the Second Amended Complaint to re-assert the medical deliberate indifference claims "[d]ue to Smith's medical deliberate indifference claim lacking the requisite conditions which applied to his failure to exhaust the excessive force and supervisory liability claims, i.e. threats of fear of adverse actions."  (Motion to Amend, Doc. 177 at 1.)

The MSP Defendants have filed three motions for summary judgment based upon a failure to exhaust administrative remedies (Docs. 20, 76, 120) because every time Mr. Smith filed an amended complaint it superseded the prior complaint.  *See Rhodes v. Robinson*, 621 F.3d 1002, 1005 (9th Cir. 2010).  Mr. Smith received leave to amend his initial Complaint after the first motion was filed and received leave to amend his Amended Complaint after the second motion was filed.  The most recent motion for summary judgment was fully briefed on January

27, 2020 (Doc. 159) and Mr. Smith filed the current Motion 75 days later.

Mr. Smith admitted in his deposition that he did not grieve any alleged medical deliberate indifference claims against Defendants Rees, Edwards, and Batista because he decided to file suit through his Amended Complaint instead. (MSP SUF, Doc. 122 at ¶ 38.)  Then on February 12, 2020, he filed a grievance stating:

> My left index finger was dislocated by IPS on or about November 5, 2016.  It has not healed properly and I suffer constant pain and immobility.  I requested from multiple staff for treatment and a specialist.  The only treatment was for recommended stretching exercises although I have continuously explained that stretching does not work and I've tried that since the injury.  There has been references to the fact that I can fix it when paroled.

The "action requested" was "Specialist. Investigation.  The attached informal returned to me."  The response does not indicate that the grievance was granted but it does state:  "Provider determined ortho visit indicated.  You were referred to ortho and the visit is pending.  Chart was reviewed." (Doc. 177-2.)

Mr. Smith suggests that the granting of this grievance has now exhausted his administrative remedies with regard to his denial of medical care claims against Defendants Edwards and Rees.  The Court does not agree.

The Court's April 3, 2019 Scheduling Order specifically indicated that the Court would not accept further motions to amend without a showing of good cause and with leave of Court.  (Doc. 35 at 7.)  Mr. Smith has not shown good cause for

waiting 23 months after filing his deliberate indifference claims to make any effort to exhaust those claims.

The Supreme Court has clarified that exhaustion cannot be satisfied by filing an untimely or otherwise procedurally infirm grievance, but rather, the PLRA requires "proper exhaustion." *Woodford*, 548 U.S. at 89. "Proper exhaustion" refers to "using all steps the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." *Id*. (emphasis in original) (*quoting Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). Thus, "[s]ection 1997e(a) requires an inmate not only to pursue every available step of the prison grievance process but also to adhere to the 'critical procedural rules' of that process." *Reyes v. Smith*, 810 F.3d 654, 657 (9th Cir. 2016) (*quoting Woodford*, 548 U.S. at 90). "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218.

That being said, an inmate exhausts available administrative remedies "under the PLRA despite failing to comply with a procedural rule if prison officials ignore the procedural problem and render a decision on the merits of the grievance at each available step of the administrative process." *Reyes*, 810 F.3d at 658. This exception, however, does not apply to Mr. Smith's claims. The February 12, 2020 grievance was not granted, it just explained that he had been referred to specialist. Mr. Smith's deliberate indifference claims arose prior to the filing of his Amended

32

Complaint and Second Amended Complaint.  As set forth above, he did not

exhaust those claims.  He should not be allowed to amend at this late date.

## V.  MOTION TO COMPEL

None of the discovery requests at issue in Mr. Smith's Motion to Compel are

relevant to whether Mr. Smith's litigation and grievances practices placed an

undue burden on LCCDC staff or the exhaustion issue regarding the MSP claims.

Therefore, the motion will be denied.

## VI.  MOTION FOR SANCTIONS

Mr. Smith moves for default judgment as a sanction against Captain

Grimmis and his counsel for allegedly willfully withholding relevant discovery

material, failing to obey the Court's Scheduling Order, and disruptions of the trial

schedule.  (Doc. 157.)  While the Court has serious concerns regarding Captain

Grimmis's untimely/lack of disclosure of documents which were arguably

relevant, there has been no showing of prejudice and default will not be entered.

Mr. Smith first claims that he received a document from the Board of

Pardons and Parole on January 1, 2020 which Captain Grimmis failed to produce

in discovery.  The document is e-mails between Michelle Jenicek and Captain

Grimmis regarding the September 2016 letter to Probation and Parole requesting

the override of Mr. Smith.  (Doc. 157-1 at 1.)  Captain Grimmis has filed an

affidavit stating that he did not retain the e-mail and it was not in his possession at

the time of the Amended Scheduling Order requiring disclosure of relevant documents.  The Court will take Captain Grimmis at his word.

Next Mr. Smith alleges that Captain Grimmis failed to respond in good faith when he denied Request for Admission 8 which asked if Captain Grimmis had knowledge of Mr. Smith's lawsuit against Mike Soto between April 2015 and September 2015.  Mr. Smith now indicates that he clearly meant to say April 2016 and September 2016 because he did not file his lawsuit against Mr. Soto until April 2016.  The Court will not impose sanctions for denying a request for admission which contained a misstatement of dates.

Finally, Mr. Smith accuses Captain Grimmis of withholding the September 22, 2016 letter to Probation and Parole until August 23, 2019.  On April 3, 2019, the Court recommended that Mr. Smith's claim that Captain Grimmis "overrode" him from LCCDC to MSP in retaliation for his litigious activities be dismissed because there was no indication that Mr. Smith's litigation activities were a substantial or motivating factor behind his transfer to prison.  (Doc. 33 at 16.) Therefore, at the time of the April 3, 2019 Amended Scheduling Order (Doc. 35) requiring disclosure of relevant documents, the only claim against Captain Grimmis was that he collaborated with Michelle Steyh, the DOC Director, and Probation Officers Loungee, Thennis, and Jenicek to place Mr. Smith in solitary confinement, have him assaulted, deny him envelopes and writing materials, and

34

take away his legal work taken from him in an attempt to freeze his ability to litigate and/or defend himself in pending legal actions. (Amended Complaint, Doc. 34 at ¶ 40.)

Arguably the September 22, 2016 letter to Probation and Parole could have been used in proving or denying Mr. Smith's claims and probably should have been turned over with Captain Grimmis's June 2019 disclosures.  But the claim regarding the override to prison had been recommended for dismissal and the document was not turned over until August 21, 2019 just five days prior to the discovery deadline.  (Doc. 68 at 1.)  Captain Grimmis argues that Mr. Smith failed to establish how he is prejudiced by these alleged violations, but Mr. Smith claims the late disclosure precluded him from seeking further discovery.  Mr. Smith filed a motion to modify the scheduling order to extend discovery on September 9, 2019 based upon the disclosure of this document.  (Doc. 68)  The Court denied the motion on October 8, 2019 because the motion was not made before expiration of the deadline at issue.  (Doc. 106.)

The failure to produce a relevant document as part of the initial disclosure process is disturbing.  Captain Grimmis does not explain why that September 2016 letter was not initially produced.  But given that the letter and the e-mails are now part of the record, there has not been a clear showing of prejudice.  Mr. Smith contends he wanted to do further discovery and that on September 11, 2019 he

filed a notice indicating he had served further discovery requests on Captain Grimmis.  (Doc. 71.)  He did not, however, file the discovery requests with his motion and they are not in the record.  Therefore, it is impossible for the Court to decide the import of those requests.  The motion for sanctions will be denied.

Based upon the foregoing, the Court issues the following:

## ORDER

1.  Mr. Smith's Motion for an Order to Compel Discovery (Doc. 153) is DENIED.

2.  Mr. Smith's Opposed Motion for Sanctions against Jason Grimmis and Mitchell Young (Doc. 157) is DENIED.

Further, the Court issues the following:

## RECOMMENDATIONS

1.  Jason Grimmis's Motion for Summary Judgment (Doc. 84) should be GRANTED.

2.  Mr. Smith's Motion for Summary Judgment against Defendant Grimmis (Doc. 100) should be DENIED.

3.  Montana State Prison Defendants' Motion for Summary Judgment for Failure to Exhaust Administrative Remedies (Doc. 120) should be GRANTED.

4.  Defendants Baltezar and Cales' Motion for Summary Judgment on Excessive Force Claims (Doc. 124) should be DENIED AS MOOT.

5.  Defendants Rees, Edwards, and Batista's Motion for Summary Judgment on Deliberate Indifference Claims (Doc. 128) should be DENIED AS MOOT.

6.  Defendants Thomas Wilson, Danel Segovia, Mike Batista, Leroy Kirkegard, and Tom Wood's Motion for Summary Judgment on Supervisory Liability Claims (Doc. 132) should be DENIED AS MOOT.

7.  Mr. Smith's Opposed Motion for Leave to Amend Second Amended Complaint (Doc. 177) should be DENIED.

8.  The Clerk should be directed to enter judgment in favor of Defendants and close this matter.

9.  The Clerk of Court should also be directed to have the docket reflect that the Court certifies pursuant to Rule 24(a)(3)(A) of the Federal Rules of Appellate Procedure that any appeal of this decision would not be taken in good faith.

### NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATIONS AND CONSEQUENCES OF FAILURE TO OBJECT

The parties may file objections to these Findings and Recommendations within fourteen (14) days after service (mailing) hereof.[3]  28 U.S.C.  § 636.  Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

---

[3]Mr. Smith is entitled to an additional three days after the fourteen-day period would otherwise expire to file his objections.

This order is not immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Fed.R.App.P.  4(a), should not be filed until entry of the District Court's final judgment.

DATED this 23rd day of September 2020.


John Johnston
United States Magistrate Judge